1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10    DAVID LANE,                          CASE NO. C09-1363 MJP

11                    Plaintiff,           ORDER ON PLAINTIFF'S MOTION
                                           FOR PARTIAL SUMMARY
12          v.                             JUDGMENT

13    MICRO-FOCUS (US), INC., KEVIN
      MOULTRUP, DENNIS HOOKER, and
14    SAM GAUCI,

15                    Defendants.

16

17          This matter comes before the Court on Plaintiff's motion for partial summary judgment.

18    (Dkt. No. 69.)  Having reviewed the motion, the response (Dkt. No. 94), the reply (Dkt. No. 99),

19    and all supporting papers, the Court DENIES the motion.

20                                    **Background**

21          Plaintiff filed suit against Defendants, seeking damages, in part, for constructive fraud

22    and negligent misrepresentation.  Plaintiff worked as an "account executive," a sales

23    representative, for Micro-Focus (US), Inc. ("Micro Focus"), a company that offers software and

24    related support services to large enterprises. (Complaint ¶¶ 3.1, 3.12.)  Plaintiff worked for Micro

Focus from August 27, 2007 through June 15, 2009.  (Lavorata Decl. (Dkt. No. 36).)  Relevant to

this motion, Plaintiff claims that he was enticed to work for Micro Focus on false premises and

that he was deceived about and denied commissions on several large deals purportedly within his

sales territory.  Plaintiff moves for partial summary judgment as to liability on his constructive

fraud and negligent misrepresentation claims.

Prior to his hire, Plaintiff had meetings with Vice President of North American Sales,

Defendant Kevin Moultrup, and Western Region sales manager, Michael Bellows, in August of

2007.  (Lane Decl. ¶ 3, Bellows Decl. ¶ 7.)  Bellows was Plaintiff's supervisor, while Moultrup

was essentially Bellow's boss.  During the meeting, Plaintiff contends that an account with

Albertsons was discussed.  After the initial meeting, Plaintiff sent Moultrup and Bellows a "start-

up plan" that incorporated what was discussed at the meeting.  (Birk Decl. Ex. A at LANE 1043-

44.)  The plan listed Albertsons as one of Plaintiff's target accounts.  (Id. at LANE 1047.)

Bellows affirms that Albertsons was an account promised to Plaintiff, as it was in Boise, Idaho.

(Bellows Decl. ¶ 7.) Bellows confirms that he told Plaintiff prior to his hire that there was a

substantial opportunity to negotiate a multi-million dollar deal at Albertsons.  (Bellows Decl. ¶

7.)

Once hired, Plaintiff again submitted a list of accounts he was in charge of that included

Albertsons.  (Birk Decl. Ex. E.)  Micro Focus agrees that Albertsons was a named account within

Plaintiff's territory throughout the fiscal year of 2008.  (Callahan Dep. at 66-19-21, 143: 1-3,

204:25-295:4, 236:14-16; Bellows Decl. ¶ 8; Dkt. No. 94 at 17.)  Plaintiff also signed an offer

letter, which included a provision that the written offer "constitutes all conditions and

agreements made on behalf of Micro Focus and supersedes any previous verbal commitments by

ORDER ON PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT- 2

1   the Company." (Lavorata Decl. Ex. 1.)  Nowhere does the offer letter include a promise

2   regarding Albertsons.  (Id.)

3          Plaintiff claims that Defendants Gauci (an account executive in the Central region),

4   Hooker (Gauci's supervisor), and Moultrup conspired to close a deal with Albertsons' parent

5   company, SuperValu, in Eden Prairie, Minnesota—Gauci's territory—without notifying Plaintiff

6   or giving him credit for the sale.  Apparently unbeknownst to Plaintiff, Albertsons had been

7   acquired by SuperValu in June 2006.  (Gauci Decl. ¶ 6; Lane Decl. Ex. I.)  Evidence shows that

8   on January 30, 2008, Micro Focus secured a purchase order with SuperValu for over $4.4

9   million.  (See Birk Decl. ¶ Ex. K (filed under seal.)  However, the purchase order lists SuperValu

10  as having a Boise, Idaho address, and Albertsons' Boise address is listed as the "ship to" and

11  "bill to" address.  (Id.; see Dkt. No. 94 at 18.)  Defendants argue that the $4.4 million deal was a

12  "novation" deal, whereby SuperValu came into compliance for having over-deployed Micro

13  Focus software without sufficient licenses at Albertsons and transferred Albertsons' Micro Focus

14  software licenses to SuperValu.  (Gauci Decl.)  The parties dispute whether this was a deal with

15  SuperValu or with Albertsons.  Lane and Bellows did not contribute work to the sale.  (Lane

16  Dep. at 189-190; Bellows Dep. at 69.)

17         The Compensation Plan stated that "Commissions are to be paid on qualifying revenue

18  streams into the assigned territory."  (Dkt. No. 94 at 18.)  The Plan prohibited salespersons from

19  doing deals outside of their territory without prior approval, the penalty for which is forfeiture of

20  the quota, compensations and commission.  (Birk Decl. Ex. G ¶ 1.7; Dkt. No. 69 at 5.)  Moultrup

21  was given authority to determine commission awards in cross-territorial commission disputes.

22  (Dkt. No. 94 at 18.)  Plaintiff argues that the $4.4 million SuperValu transaction executed by

23  Gauci with Hooker and Moultrup's knowledge was done in violation of the Plan and that the sale

24

ORDER ON PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT- 3

1    was with Albertsons in Idaho, not in Minnesota.  As evidence of concealment, Plaintiff also

2    notes that the size of the deal was not disclosed in weekly forecast calls within Micro Focus.

3    (Bellows Decl. ¶ 10.)

4          After learning of the $4.4 million sale, Plaintiff complained to Bellows, but was told not

5    to pursue the matter.  (Birk Decl. Ex. N at LANE 1146; Birk Decl. Ex. O at LANE 1147.)

6    Bellows also protested to Moultrup that the sale should have been credited to Plaintiff and the

7    Western region, not the Central region.  (Bellows Decl. ¶ 12.)  Moultrup did not alter the

8    commission award.  After the $4.4 million deal was closed, Micro Focus agreed that Plaintiff

9    would be given a 50/50 split on any SuperValu/Albertsons deals going forward.  (Birk Decl. Ex.

10   O at LANE 1147; Gauci Dep. at 129:14-130:1; Ulrich Decl. ¶ 11.)  Plaintiff points out that after

11   he was terminated, Micro Focus closed a $6.5 million deal with Albertsons in 2010.  (Moultrup

12   Dep. at 163:22-164:28.)

13         Plaintiff argues Defendants concede that he was deceived into believing that he would be

14   receive commissions for all sales with Albertsons, when in fact he was not so entitled.  (Dkt. No.

15   69 at 9-15.)  Plaintiff points to deposition testimony from Micro Focus' head of Human

16   Resources, Mary Jo Lavorata, who stated that Bellows and Moultrup did not have authority to

17   make offers or promises outside of the official offer letter from Micro Focus to Plaintiff, and that

18   any promises made outside of the letter did not have to be honored.  (Lavorata Dep. at 28-30,

19   22.)  Michael Callahan, a 30(b)(6) designee for Micro Focus, agreed that "sales representatives

20   who are being hired by the company are entitled to rely on the representations made to them by

21   the hiring person."  (Callahan Dep. at 117-118 (statement of Mr. Smart to which Callahan

22   agreed).)  Callahan also acknowledged that Albertsons was an account promised to Plaintiff.

23   (Id.)

24

1    In their brief, Defendants state that throughout the 2008 fiscal year Albertsons was

2    Plaintiff's named account, but dispute whether the deal with SuperValu had anything to do with

3    Albertsons and Lane.  (Dkt. No. 94 at 1-2.)   Defendant Gauci maintains that Albertsons

4    functionally did not exist because it was merged with SuperValu, such that any promise of

5    commissions from the account to Plaintiff would have been a misrepresentation.  (Gauci Dep. at

6    39-40.)  Defendant Hooker agrees that this would have been an unfair misrepresentation because

7    Albertsons was merged with SuperValu.  (Hooker Dep. at 102:3-23.)  Defendant Moultrup

8    disputes that he ever promised Albertsons as an account to Plaintiff, but admits that had there

9    been a representation regarding a substantial deal with Albertsons to Plaintiff, it would have been

10   a misrepresentation.  (Moultrup Dep. 38-42.)  With regard to the $4.4 million deal, Defendants

11   contend that Gauci did all of the leg work to set up and close the deal with SuperValu without

12   any interaction with Albertsons, and that Lane performed no work on the matter.  (Dkt. No. 94 at

13   6.)

14        Plaintiff argues there are three instances of negligent misrepresentation and constructive

15   fraud: (1) during the interview process, Bellows represented that Albertsons was a significant

16   opportunity to Plaintiff as an enticement, but this was not accurate; (2) after his hire, Plaintiff's

17   proposed list of accounts included Albertsons, but he was not awarded any commission on a $4.4

18   million sale to Albertsons; and (3) after the $4.4 million deal closed, Plaintiff was promised a

19   50/50 split but this was not honored in other deals, including a $6.5 million deal that closed after

20   Plaintiff was terminated.  The Court examines all three bases for Plaintiff's claims.

21                                          **Analysis**

22   A.     Standard

23

24

1    Summary judgment is proper if the pleadings, depositions, answers to interrogatories,

2    admissions on file, and affidavits show that there are no genuine issues of material fact for trial

3    and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

4    Material facts are those "that might affect the outcome of the suit under the governing law."

5    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The underlying facts are viewed in

6    the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith

7    Radio Corp., 475 U.S. 574, 587 (1986).  The party moving for summary judgment has the burden

8    to show initially the absence of a genuine issue concerning any material fact.  Adickes v. S.H.

9    Kress & Co., 398 U.S. 144, 159 (1970).  Once the moving party has met its initial burden, the

10   burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an

11   element essential to that party's case, and on which that party will bear the burden of proof at

12   trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

13   B.    Misrepresentation and Constructive Fraud Standards

14        "The elements of negligent misrepresentation are (1) a false statement (2) made to induce

15   a business transaction (3) upon which the other party justifiably relies."  Amtruck Factors v. Int'l

16   Forest Prods., 59 Wn. App. 8, 18 (1990); see Haberman v. Wash. Pub. Power Supply Sys., 109

17   Wn.2d 107, 161-62 (1987).  Negligent omission of a material fact satisfies the first element of

18   negligent misrepresentation.  Amtruck, 59 Wn. App. at 18.

19        Plaintiff alleges fraud and constructive fraud in his complaint.  There are nine elements of

20   fraud:

21             (1) Representation of an existing fact;
             (2) Materiality of the representation;
22             (3) Falsity of the representation;
             (4) The speaker's knowledge of its falsity;
23             (5) The speaker's intent that it be acted upon by the plaintiff;
             (6) Plaintiff's ignorance of the falsity;

24

1        (7) Plaintiff's reliance on the truth of the representation;

        (8) Plaintiff's right to rely upon it; and

2        (9) Resulting damages.

3 Wash. Pattern Jury Instruction § 160.01; <u>see</u> <u>Stiley v. Block</u>, 130 Wn.2d 486 (1996).  Proof must

4 be established by clear, cogent and convincing evidence.  Wash. Pattern Jury Instruction §

5 160.01.

6       As to constructive fraud, the elements are more nebulous.  "'Constructive fraud is simply

7 a term applied to a great variety of transactions, having little resemblance either in form or in

8 nature, which equity regards as wrongful, to which it attributes the same or similar effects as

9 those which follows from actual fraud, and for which it gives the same or similar relief as that

10 granted in cases of real fraud.'"  <u>Dexter Horton Bldg. Co. v. King County</u>, 10 Wn.2d 186, 191

11 (1941) (quoting Pomeroy's Equity Jurisprudence, 3rd Ed., § 922).  Plaintiff suggests that

12 constructive fraud occurs when conduct that has actual and legal effect of fraud is accompanied

13 by an "interested or sinister motive."  (Dkt. No. 69 at 17 (quoting <u>Green v. McAllister</u>, 103 Wn.

14 App. 452, 467-68 (2000)).)  The court in <u>Green</u> stated that "constructive fraud [is the] . . . failure

15 to perform an obligation, not by an honest mistake, but by some 'interested or sinister motive.'"

16 <u>Green</u>, 103 Wn. App. at 468 (quoting <u>In re Estate of Marks</u>, 91 Wn. App. 325, 336 (1998)).  In

17 analyzing Plaintiff's constructive fraud claim, the Court considers as guidelines the nine

18 elements of a fraud claim, but otherwise applies the standard set out in <u>Green</u>.  The Court is

19 concerned that there is no pattern jury instruction on point.  This is an issue that the Court will

20 work on further with parties as to jury instructions.

21 C.    <u>Deception as to a Potential Deals with Albertsons</u>

22       Plaintiff argues that he was deceived in the hiring process about whether there was a

23 potentially large deal with Albertsons.  While the parties do not dispute that Albertsons was a

24

1   named account promised to Plaintiff they dispute other key issues prevent summary judgment on

2   the claim.

3          There is a dispute of fact as to whether there were any potential deals with Albertsons at

4   the time of hire.  Plaintiff and Bellows argue that there were potential deals, arguing strenuously

5   that the $4.4 million deal was an Albertsons deal.  Defendants argue to the contrary that any

6   potential deals with Albertsons were actually deals with SuperValu.  (Hooker Dep. at 102; Gauci

7   Dep. at 39-40; Moultrup Dep. at 39 ("there was no deal at Albertsons in the West"), 41.)  The

8   Court cannot resolve this dispute of fact to determine whether Bellows' offer to Plaintiff was

9   false or misleading.  Plaintiff's justifiable reliance is also squarely in dispute.  Although Callahan

10  stated that Plaintiff could be entitled to rely on representations made to him by the hiring person,

11  Plaintiff signed a contract expressly denying him the ability to rely on any such statements.

12  (Callahan Dep. at 117:8-118:1; Moultrup Dep. at 101; Lavorata Decl. Ex. 1.)  Moreover, Plaintiff

13  has failed to show any evidence that he attempted to negotiate or close any deals with

14  Albertsons.  If he relied on Bellows' representation, it strikes the Court as highly questionable

15  that Plaintiff cannot point to any such evidence.  Plaintiff has also failed to point to evidence of

16  an interested or sinister motive underlying Bellows' representation about an Albertsons deal.

17         Disputed facts exist as to whether Bellows' statement was false, whether reliance was

18  justifiable, and whether there were any interested or sinister motives behind Bellows' statement.

19  See Amtruck, 59 Wn. App. at 18; Green, 103 Wn. App. at 467-68.  The Court DENIES partial

20  summary judgment on these claims.

21  D.     Deception as to the $4.4 Million Deal

22

23

24

1    Plaintiff seeks summary judgment on his claim that he was entitled to and misled about

2    the commission on the $4.4 million deal with SuperValu/Albertsons.  There is a dispute of fact

3    over whether Plaintiff was entitled to the commission on the deal.

4    The record lays bare the parties' dispute over whether the $4.4 million deal was an

5    Albertsons or SuperValu deal.  The Compensation Plan stated that "Commissions are to be paid

6    on qualifying revenue streams into he assigned territory."  (Dkt. No. 94 at 18.)  As Defendants

7    admit in their briefing, Albertsons was Plaintiff's account.  Yet there is a dispute of fact as to

8    whether the $4.4 million deal was an Albertsons or SuperValu deal.  The $4.4 million deal was

9    negotiated between SuperValu and Gauci with no assistance from Plaintiff.  Plaintiff points to no

10   evidence that the deal was negotiated with Albertsons, although it is listed on the purchase order

11   as the "ship to" and "bill to" target.  The fact that SuperValu and Albertsons are corporate parent

12   and subsidiary, respectively, further obfuscates whether the deal was an Albertsons deal under

13   the Compensation Plan.  Plaintiff says this was an Albertsons deal.  Defendants say this was a

14   SuperValu deal.  A fact finder must sort this out.  Without resolution of this factual dispute, the

15   Court cannot grant summary judgment on either claim.  The Court DENIES Plaintiff's motion.

16   E.    Other Commissions

17   Plaintiff also claims that he was Defendants' promise of a 50/50 split on SuperValu/

18   Albertsons deals after the $4.4 million was false and misleading.  Fatal to this claim is the fact

19   that Plaintiff cites to no SuperValu/Albertsons deals during his employment aside from the $4.4

20   million deal, which may or may not have been an "Albertsons deal."  Of the two transactions

21   Plaintiff cites, the first relates to a SuperValu/Shaws deal with Micro Focus in which Plaintiff did

22   not participate.  (Birk Decl. Ex. P; see Moultrup Decl. ¶ 17.)  There is no evidence this was

23   related in any way to Albertsons, only to SuperValu.  Moreover, the record shows that Defendant

24

1   Moultrup made a determination that the deal with SuperValu/Shaws was not attributable to

2   Plaintiff and did not award compensation.  There are no facts supporting a claim of negligent

3   misrepresentation or constructive fraud with regard to this sale.

4          The second transaction mentioned by Plaintiff is a $6.5 million deal with Albertsons that

5   was closed in 2010, after Plaintiff's termination.  Plaintiff alleges he identified the deal before he

6   was terminated.  Plaintiff contends that had he stayed at the company he would have been

7   entitled to a commission on this deal.  Oddly, Defendants argue that there was no such deal, but

8   testimony from Moultrup states that this deal did exist and did close in 2010.  (Moultrup Dep. at

9   163.)  Regardless, Plaintiff has not demonstrated how he was deceived as to this deal or why he

10  was entitled to a commission for a deal that closed well after he was terminated.  There are

11  inadequate facts supporting a claim of negligent misrepresentation or constructive fraud with

12  regard to this deal.

13         Plaintiff has not set forth the factual basis supporting either claim.  Should Plaintiff

14  pursue the claims on this issue at trial, he has a substantial burden to satisfy a claim for negligent

15  misrepresentation or constructive fraud.  The Court DENIES partial summary judgment.

16                                         **Conclusion**

17         Plaintiff has failed to show an entitlement to partial summary judgment on his negligent

18  misrepresentation and constructive fraud claims set out in the motion.  Disputed issues of

19  material fact on core issues remain.  The Court DENIES partial summary judgment.

20         The clerk is ordered to provide copies of this order to all counsel.

21         Dated this 3rd day of December, 2010.

22

23

24                                     Marsha J. Pechman
                                       United States District Judge

ORDER ON PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT- 10